```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Wendy D. Jackson,                   :

     Plaintiff,                    :

  v.                                :    Case No. 2:14-cv-495

                                                 :    JUDGE EDMUND A. SARGUS, JR.
Commissioner of Social Security,         Magistrate Judge Kemp
                                                 :

     Defendant.

## REPORT AND RECOMMENDATION

### I. Introduction

Plaintiff, Wendy D. Jackson, filed this action seeking review of a decision of the Commissioner of Social Security denying her application for supplemental security income. That application was filed on August 25, 2011, and alleged that Plaintiff became disabled on January 1, 1997.

After initial administrative denials of her claim, Plaintiff was given a video hearing before an Administrative Law Judge on January 7, 2013. In a decision dated February 1, 2013, the ALJ denied benefits. That became the Commissioner's final decision on March 24, 2014, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on July 30, 2014. Plaintiff filed her statement of specific errors on September 2, 2014, to which the Commissioner responded on December 5, 2014. No reply brief has been filed, and the case is now ready to decide.

### II. Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 41 years old at the time of the administrative hearing and who has an eighth grade education, testified as follows. Her testimony appears at pages 37-60 of the administrative record.

Plaintiff first testified that she was in special education classes in school.  She could read but had trouble understanding and remembering what she read.  She could not always determine if she got the correct change from a store purchase.  She also said she had gained about 100 pounds in two years, which she explained as being related to no longer using drugs.  She had more than two years of sobriety at the time of the hearing.  She had not worked at all since 1999, and had only a small amount of earnings that year.

Plaintiff was receiving mental health treatment at North Central Mental Health.  Dr. Bobba was her treating psychiatrist.  She described feelings of self-hate, loneliness, and not wanting to be around people.  She also had anger issues and suicidal thoughts, which had led to several recent suicide attempts.  She was paranoid as well.  Further, she experienced manic spells and frustration.  Crying spells occurred on a daily basis.  She was, however, able to attend AA meetings twice daily and to go to church.  She had been taking Seroquel for six months, which helped her sleep and eliminated her nightmares.

During the day, Plaintiff made coffee but had little energy to do anything.  She had wrist pain which affected her grip and also had a skin disorder which affected her hands.  She described a lack of concentration due to racing thoughts.  She did watch television but could not focus through an entire program.  From a physical standpoint, she had arthritis in her right knee and could not stand for long periods due to back and leg pain.  She also suffered from diabetes and had a weak bladder.  She was able to go to doctors' appointments and tried to cook or clean, often getting frustrated and taking naps.  She had an eating disorder as well as PTSD.  She said that she had all of her psychological issues before she began using drugs and alcohol.

The ALJ asked additional questions about Plaintiff's

capabilities.  In response, she said she could walk for two blocks and could lift only laundry or groceries.  She did not drive and had not used public transportation in years.

### III.  The Medical and Other Records

The medical records in this case are found beginning on page 254 of the administrative record.  The pertinent records - those that relate directly to Plaintiff's three statements of error - can be summarized as follows.  Because Plaintiff makes no specific argument about the physical residual functional capacity finding, the Court will review only the records relating to her psychological impairments.

Plaintiff received treatment for some time at Southeast, Inc.  Her admitting and discharge diagnoses included cocaine dependence, PTSD, and dependent personality disorder.  Her GAF at discharge was 65.  (Tr. 371-72).  The symptoms she described on admission to the program included nightmares, flashbacks and anxiety related to having been the victim of an assault.  She also reported low self-esteem, low energy, and poor concentration.  (Tr. 373-75).  She had a history of crack cocaine addiction dating back to 1999.

The first piece of opinion evidence is a record review done by Dr. Snyder, a psychologist.  He completed a form on April 6, 2010, reporting that Plaintiff suffered from four different types of psychological disorders, including bipolar disorder, anxiety disorder, personality disorder, and cocaine dependence.  With respect to the "B" criteria, he found only one moderate limitation, in the area of maintaining concentration, persistence, and pace, and his functional capacity assessment included moderate impairments in carrying out detailed instructions, interacting appropriately with the general public, and dealing with changes in the work setting.  He said she could have brief, superficial contact with co-workers and supervisors

and could do unskilled tasks in a low stress work environment with limited interaction with others. (Tr. 390-404).

Next, Dr. Tilley conducted a consultative examination on October 19, 2010.  He noted that Plaintiff had been receiving services through North Central Mental Health for six months.  At that time, she had been sober for seven months.  She appeared restless and disorganized during the interview and had difficulty sustaining attention and focus.  She denied suicidal thoughts.  She scored 55 on an IQ test, which Dr. Tilley deemed invalid due to her "suppressed performance."  He diagnosed PTSD, bulimia nervosa, bipolar disorder, cocaine and alcohol dependence, and borderline intellectual functioning, and rated her GAF at 50.  He believed she should continue with mental health treatment. Functionally, he concluded that she had many moderate limitations and marked limitations in the areas of maintaining attention and concentration for extended periods and completing a workday or work week without interruptions from psychologically-based symptoms.  He thought she was unemployable but also indicated that the limitations he described could be expected to last between 9 and 11 months.  (Tr. 406-08).

After the consultative examination occurred, Dr. Haskins, another state agency reviewer, completed a functional capacity assessment form.  She noted a moderate impairment in the ability to maintain attention and concentration, to sustain an ordinary routine without special supervision, and to work around others, and also thought Plaintiff was moderately limited in five other areas, including dealing with both work stress and changes in the work situation.  Nevertheless, she concluded that Plaintiff could do a variety of multi-step tasks in a work setting that was not fast-paced, which did not require close, sustained focus or attention, and which allowed her to avoid much interaction with others.  Stringent time or production requirements and frequent

changes to the work also had to be avoided.  (Tr. 409-26).

Dr. Bobba saw Plaintiff numerous times, typically on a monthly basis, at North Central Mental Health, Inc.  Dr. Bobba's notes reflect that she reported a variety of symptoms, including mood swings, and that she was diagnosed with bipolar disorder and depression.  Dr. Bobba prescribed various medications to treat her condition.  On April 23, 2012, he filled out a form entitled "Medical Assessment of Ability to Do work-Related Activities (Mental)," indicating that Plaintiff was markedly limited in, or had poor or no ability to perform, almost every work-related function listed on the form.  The only exception was a moderate impairment in the ability to maintain personal appearance.  (Tr. 618-20).  Dr. Bobba also evaluated the "B" criteria in a way that would satisfy the Listing of Impairments.  (Tr. 621).

Finally, there are some additional state agency reviewers' opinions in the record.  On November 21, 2011, Dr. Voyten, who had the benefit of Dr. Tilley's report and some of the North Central treatment records, concluded that Plaintiff could perform simple repetitive tasks in a static environment with infrequent changes in routine, could perform tasks at a consistent pace without fast-paced production demands, and could interact with others occasionally on a superficial level.  (Tr. 78-80).  Dr. Umana reached the same conclusion on March 27, 2012.  (Tr. 93-95).

### IV.  The Vocational Testimony

Tim Shaner was the vocational expert in this case.  His testimony begins on page 60 of the administrative record.

Mr. Shaner was asked some questions about a hypothetical person who could work at the light exertional level but who had to avoid concentrated exposure to hazards such as moving machinery and unprotected heights.  The person could occasionally climb ladders, ropes, or scaffolds, and frequently climb ramps or

stairs, crouch, crawl, and handle or manipulate objects.  That person was further limited to the performance of simple, routine and repetitive tasks which had to be done in a low-stress environment defined as having only occasional changes in the work setting, and could engage in work with production quotas only if measured by end-of-the-day measurements.  Lastly, the person could have only occasional, brief and superficial interaction with the public and with co-workers.  According to Mr. Shaner, someone with those limitations could work as a housekeeper, a laundry worker, or an inspector.  To remain employed, the person could not be off task 20% of the time or miss more than one day per month.

    Mr. Shaner was then asked whether someone who was limited to occasional fine and gross manipulation could do the jobs he identified.  He said no, due the fact that those jobs required frequent use of the arms and hands.  He also testified that jobs not requiring such use generally involved contact with the public, so he could not identify jobs that a person with all of the limitations, including limitations on the frequent use of hands and arms, could do.

            V.   <u>The Administrative Law Judge's Decision</u>

    The Administrative Law Judge's decision appears at pages 13-25 of the administrative record.  The important findings in that decision are as follows.

    The Administrative Law Judge found, first, that Plaintiff had not engaged in substantial gainful activity since her application date of August 25, 2011.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including degenerative disc disease, obesity, carpal tunnel syndrome, bipolar disorder, post-traumatic stress disorder, and substance abuse disorders.  The ALJ also found that these impairments did not, at any time, meet

or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at the light exertional level and that she could occasionally climb ladders, ropes, or scaffolds, and frequently climb ramps or stairs, stoop, kneel, crouch, crawl, and handle or manipulate objects.  She had to avoid concentrated exposure to hazards such as moving machinery and unprotected heights.  She was limited to the performance of simple, routine and repetitive tasks which had to be done in a low-stress environment defined as having only occasional changes in the work setting, and she could engage in work with production quotas only if measured by end-of-the-day measurements.  Also, Plaintiff could have only occasional, brief and superficial interaction with the public and with co-workers

The ALJ found that, with these restrictions, Plaintiff could do three of the jobs identified by the vocational expert - housekeeper, laundry worker, and inspector.  The ALJ further found that such jobs existed in significant numbers in the national economy.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

VI.  <u>Plaintiff's Statement of Specific Errors</u>

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ improperly rejected the opinion of the treating psychiatrist, Dr. Bobba; (2) the ALJ did not properly evaluate Plaintiff's credibility; and (3) the ALJ should have obtained testimony from a medical expert.  These claims are evaluated under the following standard.

<u>Standard of Review.</u>  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial

evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

A.  The Treating Psychiatrist

In her first statement of error, Plaintiff asserts that the ALJ did not afford substantial weight to Dr. Bobba's opinions and gave improper weight to the opinions of the non-examining sources.  In order to evaluate this claim, it is helpful to start with what the ALJ had to say about the opinion evidence.

In deciding how much weight to give to both the treating source and the state agency reviewers, the ALJ said:

> The bulk of the record was reviewed by the State agency consultants Karla Voyten, Ph.D [and[ Roseann Umana, Ph.D....  Dr. Voyten and Dr. Umana concluded that the claimant could perform simple and repetitive tasks, work at a consistent pace without fast-paced

> production demands, interact with others occasionally
> on a superficial level, and perform tasks in a static
> environment with infrequent changes in routine.  They
> are acceptable medical sources whose opinions are
> largely plausible, credible, and consistent with the
> weight of the evidence, and are given great weight.
>
> * * *
>
> The opinions of Sharda Bobba, MD are given little
> weight.  Dr. Bobba [sic] statements that the claimant
> has many "marked" and "extreme" limitations in basic
> areas of mental functioning are inconsistent with the
> weight of the evidence (Exhibit B21F), for the reasons
> given above, and is [sic] also inconsistent with the
> opinions of P. Potaraju, MD and R. Scarnati, DO, both
> of whom are physicians who also treated the claimant at
> North Central Mental Health Center and gave
> considerably more benign assessments of the claimant
> (*e.g.* Exhibit B24F pp. 10, 23).  They are both
> acceptable medical sources whose opinions are
> plausible, credible, consistent with the weight of the
> evidence, and are given great weight.

(Tr. 21-22).  The Commissioner defends the ALJ's decision by pointing out that, in his review of the evidence, the ALJ found that Plaintiff benefitted from mental health treatment, that the notes of treatment showed only moderate levels of impaired functioning, that Plaintiff often discontinued her medication or skipped treatment sessions, that she did not put forth much effort on Dr. Tilley's tests, and that her ability to attend daily AA meetings and doctors' appointments showed that she could (unlike Dr. Bobba's conclusions) relate to others, keep a schedule, and perform simple cognitive tasks.

The law in this area is clear.  A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating

a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990).  The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living.  Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994).  No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision.  Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

   Here, Plaintiff's claim is somewhat difficult to evaluate.  Other than the general argument that the ALJ gave too much weight to the opinions of doctors other than Dr. Bobba, Plaintiff does not explain why the ALJ's reasoning was faulty, identify any mistaken interpretations of the evidence, or suggest that the ALJ's statement of reasons was inadequate to satisfy the "articulation rule" found in 20 C.F.R. §416.927(c).  The only specific assertion she makes is that it was error for the ALJ to rely on the prior assessments done at North Central by Drs. Potaraju and Scarnati because they had little contact with Plaintiff.

   The precise information which the ALJ cited in his decision consists, first, of treatment notes from November 12, 2012, completed by Dr. Potaraju.  They show that Plaintiff presented as "very labile" and had expressed suicidal thoughts but that she was cooperative, alert and oriented, and that her concentration and attention were normal.  She appeared to be depressed and

-10-

anxious, and she seemed to have symptoms of borderline personality disorder.  (Tr. 708-09).  Second, the ALJ referred to a note prepared by Dr. Scarnati dated April 6, 2012, which stated that Plaintiff did "OK" on her medications but got angry when she stopped taking them, and that she had no plans to harm herself.  Dr. Scarnati also indicated that Plaintiff was alert, oriented, and cooperative, and his notes did not reflect any signs of depression or anxiety.  In fact, he described Plaintiff's mood and affect as normal and appropriate.  (Tr. 722-23).  Dr. Bobba's notes, by contrast, typically characterized Plaintiff's concentration and attention as abnormal and indicated a guarded attitude, pressured speech, and increased psychomotor activity.

    There is no question that Dr. Bobba provided Plaintiff more treatment then did either Dr. Potaraju or Dr. Scarnati, although they were also treatment providers who apparently saw Plaintiff when Dr. Bobba was unavailable.  Nevertheless, Dr. Bobba was the one with the longest treating relationship, which is a significant factor under §416.927(c), and it may well have been error for the ALJ to credit the other two doctors' observations over Dr. Bobba's just because they were more in keeping with a finding of no disability.  The same would be true of any decision to credit the state agency reviewers' opinions over Dr. Bobba's simply because the two sets of opinions conflicted.  See Gayheart v. Comm'r of Social Security, 710 F.3d 365, 377 (6th Cir. 2013).

    But that is not what happened here.  The ALJ, albeit through the use of the same litany of general reasons (the opinions he credited were described as being from "acceptable medical sources whose opinions are plausible, credible, consistent with the weight of the evidence, and are given great weight"), explained that his decision was based not only on the conflicting medical opinions but the balance of the evidence.  In his general discussion of that evidence, he did, as the Commissioner's memorandum notes, see Doc. 14 at 4-6, discuss all of the record

evidence, not just the conflicting medical opinions, and relied on factors such as the lack of more significant symptoms in the treatment notes, the history of sporadic treatment, the Plaintiff's medical noncompliance, and the fact that she could engage in activities which appeared to be inconsistent with the extreme limitations described in Dr. Bobba's report. Those are all legitimate factors to be taken into account in deciding how much weight to give to the opinion evidence.

Plaintiff does not attack, or even mention, all of this other evidence, or argue that the ALJ erred in relying on it. The only true issue her generalized argument raises is that the ALJ made a legal error by preferring opinions from sources other than the treating doctor. Since an ALJ may, on the basis of the evidence, choose to discount a treating source's opinion and to give greater weight to the opinions of either sources who provided less frequent treatment - here, Drs. Potaraju and Scarnati - or to nonexamining state agency physicians, the ALJ did not make a legal error by doing so. See, e.g., Warner v. Comm'r of Social Security, 375 F.3d 387, 390 (6th Cir. 2004)("[t]reating physicians' opinions are only given ... deference when supported by objective medical evidence"). Plaintiff's first statement of error is therefore without merit.

### B. The Credibility Determination

Plaintiff's next argument is that the ALJ did not make a proper credibility determination. She contends that her testimony was consistent both with the opinion of Dr. Bobba and with the record as a whole, and that the ALJ erred in using her past history of substance abuse as a reason to find her testimony less than credible. She also asserts that the ALJ did not directly address many of the credibility factors found in Social Security Ruling 96-7p, including statements from the various medical sources about the effect of her symptoms on her ability to work, the consistency of her statements about her limitations,

and the record of her attempts to seek treatment.  Plaintiff does not, however, identify any specific physical or psychological limitations which she thinks the ALJ should have found based on her testimony.

The ALJ cited to various items of evidence in determining that Plaintiff was not fully credible.  They included her history of drug abuse, which led to her reporting unfounded physical symptoms while she was still an active drug user; her claim that while she was spending hundreds of dollars a day on cocaine, she could not afford a $4.00 prescription; the inconsistency between physical symptoms she reported in 2011 and the medical findings; her inconsistent attendance at physical therapy sessions; and her sporadic efforts at treatment for psychological conditions.  (Tr. 19-21).  The ALJ concluded, at Tr. 21, that "the weight of the evidence does not indicate that the claimant's symptoms are as severe as alleged," and he also noted the discrepancy between her reported symptoms and the opinions of the four doctors to whose opinions as to her psychological limitations he assigned great weight.  Id.

It is not clear exactly what errors Plaintiff claims the ALJ made in his assessment of her credibility.  His decision explicitly refers to, and at times quotes directly from, SSR 96-7p.  He enumerated many factors which are set forth in that ruling and discussed how the evidence led him to conclude that her testimony was not entirely believable.  Other than the fact that she and Dr. Bobba appeared to agree on the severity of her symptoms - and the Court has already found that the ALJ had good reasons for not crediting Dr. Bobba's opinions in full - she really does not point to anything which would support a more favorable credibility finding.  In any event, as this Court has said repeatedly, "an ALJ's credibility finding is something that a reviewing court 'may not disturb absent compelling reason[s]'...."  Kaplun v. Comm'r of Social Security, 2015 WL

-13-

736475, *7 (S.D. Ohio Feb. 20, 2015), quoting Smith v. Halter, 307 F.3d 377, 379 (6th Cir. 2001). No such reasons exist here, and Plaintiff's second statement of error provides no basis for a reversal or remand of the ALJ's decision.

### C. Medical Expert Testimony

Plaintiff's final argument is that the ALJ should have obtained the opinion of a medical expert, and that the ALJ erred by interpreting the medical evidence without the benefit of expert evaluation. As with her other two claims of error, this argument is lacking in detail; Plaintiff does not identify whether she is speaking of evidence surrounding her physical impairments, her psychological impairments, or both, and she does not specify what parts of the medical evidence the ALJ either improperly interpreted on his own or which would have benefitted from some clarification from a medical expert. She also does not comment on the fact that the record was reviewed by multiple medical experts upon whom the ALJ relied in reaching his residual functional capacity findings.

In Smith v. Comm'r of Social Security, 2010 WL 6303884, *6 (S .D. Ohio Nov 24, 2010), adopted and affirmed 2011 WL 1125031 (S.D. Ohio Mar 24, 2011), this Court said:

> As the court observed in Griffin v. Astrue, 2009 WL 633043 *10 (S.D. Ohio March 6, 2009), "[t]he primary function of a medical expert is to explain, in terms that the ALJ, who is not a medical professional, may understand, the medical terms and findings contained in medical reports in complex cases." Whether to call such an expert to testify is generally left to the discretion of the ALJ, see id., quoting Haywood v. Sullivan, 888 F.2d 1463, 1467–68 (5th Cir. 1989), and the Court may overturn the exercise of that discretion only if it appears that the use of a medical consultant was necessary — rather than simply helpful — in order to allow the ALJ to make a proper decision. See Landsaw v. Secretary of Health and Human Services, 803 F.2d 211, 214 (6th Cir. 1986), quoting Turner v. Califano, 563 F.2d 669, 671 (5th Cir. 1977).

-14-

Plaintiff's argument does not address this standard, nor does she explain why the services of a medical expert were necessary in this case.

Here, the ALJ did not simply have a collection of raw medical data to interpret.  The record included opinions from treating sources, consultative examiners, and state agency physicians.  The ALJ derived his residual functional capacity from their interpretation of the medical findings and not his own.  There has been no showing that the evidence in this case was so complex or of such a specialized nature that the expert opinions upon which the ALJ relied were insufficient to allow him to understand the record.  In short, as the Commissioner argues, Plaintiff has not established "any reason the record was lacking that would indicate that the ALJ should have obtained medical expert testimony."  Doc. 14, at 11.  That being the case, there is no basis to reverse the ALJ's decision because the ALJ did not exercise his discretionary power to obtain additional medical expert opinions.

## VII.    Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant.

## VIII.   Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a <u>de novo</u> determination of those portions  of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or

recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

        /s/ Terence P. Kemp
        United States Magistrate Judge